

**NUMBER 13-26-00158-CR**

**COURT OF APPEALS**

**THIRTEENTH DISTRICT OF TEXAS**

**CORPUS CHRISTI – EDINBURG**

---

HEATHER RENE CAMERON,                                                         Appellant,

v.

THE STATE OF TEXAS,                                                         Appellee.

---

**ON APPEAL FROM THE CRIMINAL DISTRICT COURT NO. 4
OF TARRANT COUNTY, TEXAS**

---

## MEMORANDUM OPINION

**Before Chief Justice Tijerina and Justices Silva and Cron
Memorandum Opinion by Justice Cron**

Appellant Heather Rene Cameron entered an open plea of guilty to one count of theft of property with a value between $30,000 and $150,000, a third-degree felony. *See* TEX. PENAL CODE § 31.05(a), (e)(5). The trial court found Cameron guilty and sentenced her to eight years in prison. *See id.* § 12.34(a). By a single issue, Cameron complains

that her sentence is grossly disproportionate to the offense she committed, and, therefore, constitutionally infirm under the Eighth Amendment. She asks that we reverse her sentence and remand for a new punishment hearing. We affirm.[1]

## I. BACKGROUND

It is undisputed that over the course of thirteen months, Cameron stole a total of $120,468.74 from her longtime employer, a small business owned by David and Juli Tierney. Cameron, who was the company's bookkeeper for approximately twenty-six years, perpetrated the crime by writing forty-one fraudulent checks to herself during the relevant period.

After Cameron entered her guilty plea, the trial court deferred a finding on guilt and requested a presentence investigation (PSI) report. *See* TEX. CODE CRIM. PROC. art. 42A.252. The PSI report was prepared by supervision officer Edward Sas, and both Cameron and the Tierneys participated in the process by answering Sas's questions and supplying him with supporting documents.

At the subsequent adjudication hearing, the trial court announced that it had "thoroughly reviewed" the 35-page report, which was the only evidence offered or admitted at the hearing. The parties focused on the contents of the report during the hearing, with each side highlighting portions they felt supported their preferred disposition. For instance, Cameron argued she was a good candidate for community supervision

---

[1] This appeal was transferred to us from the Second Court of Appeals in Fort Worth pursuant to a docket-equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE §§ 22.220(a) (delineating the jurisdiction of appellate courts), 73.001 (granting the supreme court the authority to transfer cases from one court of appeals to another at any time that there is "good cause" for the transfer). We are bound by the transferring court's precedent to the extent that it differs from our own. *See* TEX. R. APP. P. 41.3.

because, as the report noted, she "appears capable of completing a term of probation successfully"; the fifty-two-year-old had "no prior criminal history"; her risk assessment showed a "low" chance of recidivism at only 8%; she took some "responsibility for her crime" by pleading guilty and "providing details about her actions in its commission"; she "has a history of volunteerism, and has numerous ties to the community"; she was gainfully employed at the time of the hearing, including a fulltime job as a bookkeeper and another parttime job; and she "has the support of her family," some of whom had written letters of support that were attached to the report. The report also noted that Cameron "suffer[s] from very serious health problems" that "require constant care, medications, and maintenance." Sas expressed concern that if Cameron were imprisoned, it would "be difficult to replicate" the level of care she was receiving from her numerous specialists.

However, the report also listed factors that, in Sas's opinion, weighed against community supervision. Sas considered the crime "egregious" because, among other reasons, Cameron and "[t]he victims were practically family," and her actions represented a "betrayal" that caused significant emotional and financial harm to the Tierneys. In terms of the financial harm, Sas explained that Cameron initially offered the Tierneys $30,000 in restitution if they agreed not to pursue charges, an offer the Tierneys rejected. He also noted that, despite her new employment, Cameron had not repaid any amount during the pendency of the case and that her willingness to do so was conditioned upon her receiving community supervision. In this regard, Sas felt that Cameron had not fully accepted responsibility for her actions. Sas also found unconvincing some of Cameron's explanations for why she broke bad at age fifty. For example, Cameron explained that

3

she had been in an abusive relationship for roughly ten years prior to the offense, but Sas noted that the relationship ended several years before Cameron began stealing from the company. Sas also found that Cameron used most of the stolen money, not to pay outstanding bills, but to make "hundreds upon hundreds" of "frivolous purchases." He detailed how the frequency of her online shopping dramatically escalated during the relevant period and surmised that Cameron "was a person addicted to a lifestyle." Finally, with respect to Cameron's medical conditions, he noted that although serious, Cameron was currently "working two jobs, including one with full-time hours, which is one indicator her health issues are, at present, chronic rather than completely debilitating."[2]

Sas ultimately concluded that "a taste of incarceration is warranted, as the mere threat of incarceration did not prevent her offense nor serve as a proper motivator to provide reasonable restitution during this process." The State requested "a prison sentence on the higher end of the range," and Cameron asked for community supervision, or in the alternative, a sentence at "the lowest possible range." The trial court found Cameron guilty of the charged offense, sentenced her to a prison term of eight years, and ordered her to pay $120,468.74 in restitution.

Cameron filed a verified motion for new trial arguing, among other things, that her sentence constituted cruel and unusual punishment because it "was grossly

---

[2] Sas noted that Cameron's "primary diagnosis is Granulomatosis with Polyangiitis (GPA, formerly known as Wegener's Disease)—an autoimmune disease which is difficult to treat (as it appears the body is, in essence, attacking itself)." He provided a synopsis of the disease from the Mayo Clinic, which describes GPA as "a rare disease that causes swelling, also called inflammation, of small blood vessels," primarily "in the nose, sinuses, throat, lungs and kidneys," although "it can affect any organ." According to that same overview from the Mayo Clinic, "Early treatment can help people live full lives. Without treatment, the condition can lead to organ damage that sometimes is fatal."

disproportionate to the facts of the case and reflected no consideration of mitigative evidence." There was no evidence attached to the motion, and the trial court denied the motion without conducting a hearing. This appeal ensued.

## II.     STANDARD OF REVIEW & APPLICABLE LAW

The Eighth Amendment's prohibition on cruel and unusual punishment, made applicable to the states by the Due Process Clause of the Fourteenth Amendment, includes sentences that are disproportionate to the crime committed. *Solem v. Helm*, 463 U.S. 277, 284 (1983); s*ee* U.S. CONST. amends. VIII, XIV. A successful challenge to proportionality is exceedingly rare and requires the sentence be "grossly disproportionate" to the crime. *State v. Simpson*, 488 S.W.3d 318, 322–23 (Tex. Crim. App. 2016) (citing *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003)). Stated differently, the Eighth Amendment "does not require strict proportionality between the crime and the sentence." *Id.* at 322 (citing *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991) (Kennedy, J., concurring)). Generally, if a sentence is assessed within the legislatively determined range, it will be deemed constitutional. *See Ex parte Chavez*, 213 S.W.3d 320, 323–24 (Tex. Crim. App. 2006) (noting that "the sentencer's discretion to impose any punishment within the prescribed range [is] essentially 'unfettered'"). The punishment range for a third-degree felony is "imprisonment  in the Texas Department of Criminal Justice for any term of not more than 10 years or less than 2 years." TEX. PENAL CODE § 12.34(a).

Evaluating a claim of gross disproportionality is a two-step process. First, "a court must judge the severity of the sentence in light of the harm caused or threatened to the victim, the culpability of the offender, and the offender's prior adjudicated and

unadjudicated offenses." *Simpson*, 488 S.W.3d at 323 (citing *Graham v. Florida*, 560 U.S. 48, 60 (2010)). Second, "[i]n the rare case in which this threshold comparison leads to an inference of gross disproportionality, the court should then compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions." *Id.* (citing *Graham*, 560 U.S. at 60). A sentence will be deemed cruel and unusual only when "this comparative analysis validates an initial judgment that the sentence is grossly disproportionate." *Id.* (citing *Graham*, 560 U.S. at 60). When the record lacks evidence that would allow a court to conduct a comparative analysis, the appellant has necessarily failed to substantiate their Eighth Amendment claim. *Trevino v. State*, 676 S.W.3d 726, 730 (Tex. App.—Corpus Christi–Edinburg 2023, no pet.) (citing *Simpson*, 488 S.W.3d at 323, 324); *Hammer v. State*, 461 S.W.3d 301, 304 (Tex. App.—Fort Worth 2015, no pet.); *see also Esquivel v. State*, No. 13-21-00179-CR, 2022 WL 17492274, at *2 (Tex. App.—Corpus Christi–Edinburg Dec. 8, 2022, pet. ref'd) (mem. op., not designated for publication) ("[B]ecause the trial court had no evidence before it that would allow it to engage in the comparative analysis detailed in *Simpson*, we cannot conclude it erred by sentencing Esquivel within the statutory guidelines.").

### III.    ANALYSIS

By her sole issue, Cameron argues that there were numerous factors in the PSI report that made her "the perfect candidate for probation." She contends that the trial court "failed to give proper consideration to the mitigative history," including her "severe medical condition and her appropriateness for probation." She also claims that because

6

of her "medical condition and the unsuitability and inability of the prison to provide appropriate medical treatment," her sentence is "analogous to a death sentence."

To begin with, we reject Cameron's argument that she established an Eighth Amendment claim based on inadequate medical care before she ever stepped foot in prison. To be sure, the Eighth Amendment imposes an obligation on prison officials to guarantee that inmates like Cameron receive "adequate" medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). But to prevail on a claim of inadequate medical care under the Eighth Amendment, a prisoner must show that prison officials have been deliberately indifferent to their serious medical needs. *Id.* at 835. Sas's mere concern that Cameron may not receive the same level of medical care in prison, even if well-founded, does not establish that her care will be constitutionally inadequate. *See id.; Kosilek v. Spencer*, 774 F.3d 63, 82–83 (1st Cir. 2014) (explaining that the Eighth Amendment "does not impose upon prison administrators a duty to provide care that is ideal, or of the prisoner's choosing"; instead, it only "proscribes care that is so inadequate as to shock the conscience" (citation modified)). His generalized concern does not establish "a substantial risk of serious injury" to Cameron based on the "current attitudes and conduct" of prison officials. *Farmer*, 511 U.S. at 845, 847. And it certainly does not establish that Cameron's sentence is tantamount "to a death sentence," as she suggests. Simply put, her claim of potentially inadequate medical care is entirely speculative.

Moreover, Cameron has pointed us to no authority standing for the proposition that Cameron's medical conditions, which have no bearing on the harm she caused or her culpability, could give rise to a claim of gross disproportionately. *See Simpson*, 488

7

S.W.3d at 323. Essentially, Cameron would rather we "judge the severity of the sentence in light of" her medical issues, rather than the factors outlined in *Simpson*. *Id.* But suffering from a medical condition, even a serious one, does not exempt an offender from being imprisoned for their crime. *Cf. United States v. Bates*, 784 F. App'x 312, 335 (6th Cir. 2019) (explaining that, under federal sentencing guidelines, "[a]lthough district courts may rely on age and poor health to support a below-guidelines sentence in exceptional cases, the elderly do not have a license to commit crime, and adequate medical care is available in federal prisons" (citation modified)). To the extent that Cameron's medical conditions are "normatively relevant to [a factfinder's] determination of a proper punishment," *Beham v. State*, 559 S.W.3d 474, 484 (Tex. Crim. App. 2018), we fail to see how the trial court's discretionary decision to give greater weight to other normative facts and assess punishment within the legislatively prescribed range makes her sentence grossly disproportionate to the crime she committed. *See Ex parte Chavez*, 213 S.W.3d at 323–24.

But even if we assumed, based on the entire record, that this was one of the exceedingly rare cases that gave rise to an inference of gross disproportionality, Cameron's claim would nevertheless fail because there is no evidence in the record that would allow us (or the trial court) to conduct a comparative analysis. *See Trevino*, 676 S.W.3d at 730; *Hammer*, 461 S.W.3d at 304. Accordingly, Cameron's issue is overruled.

8

## IV. CONCLUSION

We affirm the judgment of conviction.

JENNY CRON
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
6th day of August, 2026.

9